# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| ANATOLII LEGKODYMOV, | ) | CASE NO. 4:25-CV-02145-CAB |
| | ) | |
| Petitioner, | ) | JUDGE CHRISTOPHER A. BOYKO |
| | ) | UNITED STATES DISTRICT JUDGE |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| STEPHEN EBERLE, *et al.* | ) | JENNIFER DOWDELL |
| | ) | ARMSTRONG |
| | ) | |
| Respondents. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| | ) | |

## I.      INTRODUCTION

Petitioner, Anatolii Legkodymov ("Mr. Legkodymov") filed a petition for a writ of habeas corpus under 28 U.S.C. § 2241. (ECF No. 1). Mr. Legkodymov is currently detained in the Northeast Ohio Correctional Center while awaiting possible extradition to France pursuant to a certification of extraditability and order of commitment entered by United States Magistrate Judge Christopher B. Brown of the United States District Court for the Western District of Pennsylvania. (ECF No. 1, ¶ 1; ECF No. 1-2).

Mr. Legkodymov asserts four grounds for relief, arguing that Magistrate Judge Brown violated his due process rights in several respects by issuing the extradition order. He names as respondents Stephen Eberle, United States Marshal for the Western District of Pennsylvania; Ed Voorhies, Warden of the Northeast Ohio Correctional Center; Peter Elliott, United States Marshal for the Northern District of Ohio; Pamela Bondi, the former United States Attorney General; and Marco Rubio, the United States Secretary of State ("Respondents").

This matter was referred to me on October 8, 2025 under Local Rule 72.2 to prepare a

1

report and recommendation on Mr. Legkodymov's petition. (*See* ECF non-document entry dated October 8, 2025). For the reasons set forth below, I recommend that the Court DENY Mr. Legkodymov's petition for a writ of habeas corpus.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

Mr. Legkodymov is a citizen of Russia. (ECF No. 1, ¶ 4). He is a software engineer and a co-founder of Bitzlato, a cryptocurrency exchange platform. *Id*. at ¶ 13. The Government asserts that, since August 25, 2018, Mr. Legkodymov served as the director and majority shareholder of Bitzlato. The Government further asserts that Mr. Legkodymov referred to himself as Bitzlato's CEO.

The French Government alleges that Bitzlato was used to facilitate a variety of illegal transactions, including drug trafficking. In connection with its extradition request, the French Government submitted evidence that it contends shows Mr. Legkodymov knew that some of Bitzlato's customers were using the platform to carry out those activities. That evidence includes statements from Mr. Legkodymov that drug addicts constituted approximately 4.5 percent of Bitzlato's profits; that Bitzlato's users were crooks who used fake identities; and that Bitzlato had "at least 20 percent 'dirt.'" (ECF No. 7-2, PageID # 429, 436, 437).

On January 14, 2023, the United States filed an amended criminal complaint against Mr. Legkodymov in the United States District Court for the Eastern District of New York on one count of operating an unlicensed money transmitting business in violation of 18 U.S.C. § 1960, in a case captioned *United States v. Legkodymov*, case number 1:23-cr-00496 (E.D.N.Y. Docket, ECF No. 3). On December 6, 2023, Mr. Legkodymov pled guilty to the § 1960 charge. (E.D.N.Y. Docket, ECF No. 21). On July 18, 2024, the district court sentenced Mr. Legkodymov to time served plus two years of supervised release. (E.D.N.Y. Docket, ECF Nos. 51, 55).

Mr. Legkodymov asserts that, following his arrest, he cooperated with the Government.

(ECF No. 1, ¶ 15). He also asserts that he agreed to a multi-day interview with French prosecutors and investigators to assist with their own investigation. *Id*. Mr. Legkodymov says that those conversations occurred pursuant to a non-prosecution agreement with French authorities. *Id*. He also says that several Assistant United States Attorneys helped to broker the non-prosecution agreement and were present for his interviews with French prosecutors and investigators. *Id*.

Mr. Legkodymov has not submitted any written non-prosecution agreement, nor has he submitted affidavits or other evidence in which French prosecutors expressly acknowledge that the agreement exists. However, he does point to a statement that his counsel made during an interview that "[w]e understand, as you explained to me in our phone conversation, it's not immunity in the same way as it is in the United States, but we understand he is doing this in lieu of prosecution in France and we are happy to continue to cooperate." (ECF No. 9-3, PageID # 745, 94:13-20). In response, a French official replied "[t]hank you." *Id*. at 94:21. Mr. Legkodymov argues that, by failing to dispute his counsel's statement, French prosecutors and investigators effectively confirmed the existence of the non-prosecution agreement.

After Mr. Legkodymov was sentenced in the Eastern District of New York, he was detained pending removal to Russia. (ECF No. 1, ¶ 4). However, while he was awaiting removal, French authorities submitted a request to the United States Department of State, requesting that Mr. Legkodymov be extradited to France so that he could be prosecuted for eight offenses under French law. (ECF No. 7-2, PageID # 326). Only three of those offenses, two money laundering charges and a conspiracy charge, were referred to extradition court for consideration. (*Id*. at PageID # 324, ¶ 5; ECF No. 7-5, ¶ 4 n.1).

On September 23, 2025, following an extradition hearing, Magistrate Judge Brown issued a certification of extraditability and committal for extradition. (ECF No. 1-2). In an accompanying opinion, Magistrate Judge Brown found that there was probable cause to support the French

charges against Mr. Legkodymov. (ECF No. 1-3). Magistrate Judge Brown also held that Mr. Legkodymov's arguments against extradition—including the alleged existence of the non-prosecution agreement and the fact that the French charges arose from the same underlying conduct as the United States prosecution—did not provide a basis to deny extradition. *Id*. Mr. Legkodymov is currently detained at the Northeast Ohio Correctional Center. (ECF No. 1, ¶ 1). The Embassy of the Russian Federation has objected to his extradition and has asked the United States Department of State to assist in returning Mr. Legkodymov to Russia. (ECF No. 9-2).

On October 7, 2025, Mr. Legkodymov filed the present petition, in which he asserts that Magistrate Judge Brown violated his due process rights under the Fifth Amendment in issuing the certification of extraditability. (ECF No. 1). On November 21, 2025, Respondents filed a response in opposition to Mr. Legkodymov's petition. (ECF No. 7). On January 5, 2026, Mr. Legkodymov filed his traverse. (ECF No. 9).

## III. LEGAL STANDARDS

"Federal law authorizes the United States Secretary of State to designate federal and state judges or magistrate judges to conduct hearings whenever a foreign nation requests an individual's extradition under the terms of a treaty." *Martinez v. United States*, 828 F.3d 451, 455 (6th Cir. 2016) (citing 18 U.S.C. § 3184). "If the judge 'deems the evidence sufficient to sustain the charge,' the statute provides, 'he shall certify … to the Secretary of State' that the individual is extraditable." *Id*. (quoting 18 U.S.C. § 3184). A magistrate judge's certification of extraditability "is not appealable, although the accused may challenge it through a petition for a writ of habeas corpus." *Id*.; *see also Nagy v. United States*, No. 4:18 CV 416, 2018 WL 3999683, at *1 (N.D. Ohio June 19, 2018), *report and recommendation adopted*, 2018 WL 3996296 (N.D. Ohio Aug. 21, 2018) ("Because certification of extraditability is not . . . a final order, there is no direct appeal from an order certifying extradition. The only method of review is through collateral habeas corpus

proceedings."). "Following certification, the Secretary of State decides, as a matter of discretion, whether to extradite the accused." *Martinez*, 828 F.3d at 455 (citing 18 U.S.C. § 3186).

"The scope of habeas review of an extradition action is highly constrained: '[H]abeas corpus is available only to inquire whether the magistrate had jurisdiction, whether the offense charged is within the treaty and, by a somewhat liberal extension, whether there was any evidence warranting a finding that there was reasonable ground to believe the accused guilty.'" *In re Extradition of Drayer*, 190 F.3d 410, 415 (6th Cir. 1999) (quoting *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925)).

## IV.     ANALYSIS

Mr. Legkodymov asserts four grounds for relief, arguing that Magistrate Judge Brown violated his due process rights because: (1) Magistrate Judge Brown failed to give effect to the alleged non-prosecution agreement between Mr. Legkodymov and French authorities; (2) Magistrate Judge Brown certified extraditability for offenses based on the same underlying conduct for which Mr. Legkodymov had already been prosecuted in the Eastern District of New York; (3) probable cause does not support the French charges; and (4) Magistrate Judge Brown did not clearly limit extradition to only the three charges on which the French government sought extradition. I will consider each argument in turn.

### A. <u>Non-Prosecution Agreement</u>

Mr. Legkodymov first argues that Magistrate Judge Brown violated his due process rights by issuing a certificate of extraditability to France even though French authorities promised Mr. Legkodymov that he would not be prosecuted in France in return for his agreement to cooperate. Magistrate Judge Brown rejected Mr. Legkodymov's arguments regarding the alleged non-prosecution agreement on the merits, holding that the extradition treaty did not contemplate denying extradition on the basis of such an agreement; that there was no authority to deny

extradition on the basis of the agreement; and that the alleged agreement apparently did not exist.

It is not clear that the Court has jurisdiction to hear Mr. Legkodymov's argument on this issue. As noted above, a habeas court's review of an extradition order is limited to determining whether the extraditing court had jurisdiction, whether the offense was within the scope of the treaty, and whether there was any evidence warranting a finding of probable cause. *Drayer*, 190 F.3d at 415. Mr. Legkodymov's argument that Magistrate Judge Brown should have given effect to the alleged non-prosecution agreement does not appear to implicate the extraditing court's jurisdiction or whether the offenses are within the scope of the treaty. And, while an alleged non-prosecution agreement may impact whether Mr. Legkodymov could be *convicted* in a French court, it also does not appear to impact whether there is probable cause to believe Mr. Legkodymov committed the relevant offenses.

Even assuming Mr. Legkodymov's argument does fall within the permissible scope of habeas review, Respondents argue that the extradition court itself lacked jurisdiction to consider the impact of the alleged non-prosecution agreement because that issue is for the Secretary of State, not a court, to consider. The law on that question is uncertain in the circumstances presented here.

The Supreme Court has held that, "when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be a part of the inducement or consideration, such promise must be fulfilled." *Santobello v. New York*, 404 U.S. 257, 262 (1971). As the Sixth Circuit has also noted, "[t]his logic has been extended to immunity agreements." *Drayer*, 190 F.3d at 412 (citing cases). "Furthermore, breach of an immunity agreement entered into by the United States with a defendant has been held sufficient to grant habeas relief in the face of a request for extradition." *Id*. (citing *Plaster v. United States*, 720 F.2d 340, 350 (4th Cir. 1983)).

Whether an immunity or non-prosecution agreement can preclude extradition appears to

6

turn on the extent to which United States officials were involved in the agreement. In *Drayer*, for example, the petitioner sought habeas relief to prevent his extradition to Canada on murder charges, arguing that Canada had agreed not to seek extradition in return for his cooperation. *Id*. at 411-12. Specifically, the petitioner alleged that a corporal in the Royal Canadian Mounted Police visited him in state prison in Ohio and offered the agreement. *Id*. at 412.

The Sixth Circuit held that the purported agreement did not bar extradition because the petitioner was unable "to show either that the United States was a party to the alleged cooperation agreement or that [the Canadian official allegedly offering immunity] acted under the authority of the United States." *Id*. at 413. The court further held that, while Ohio officials may have helped to broker the agreement by permitting the corporal to visit the petitioner in prison, "there [was] nothing . . . to indicate that they knew about the substance of the discussions between the two," and that "[s]imply filing a warrant or a complaint for extradition at the request of Canadian authorities does not make Ohio or the United States a party to the cooperation agreement." *Id*. Accordingly, the court concluded that "[u]nder the circumstances, it strikes us that the appropriate place to raise a defense based upon the cooperation agreement would be in any subsequent Canadian proceeding." *Id*.

By contrast, Mr. Legkodymov relies on *Plaster v. United States*, 605 F. Supp. 1532 (W.D. Va. 1985), *aff'd*, 789 F.2d 289 (4th Cir. 1986). There, military prosecutors granted the petitioner immunity from prosecution and promised him that he would not be extradited to West Germany to face prosecution for murder. *Id*. at 1533. After the United States subsequently sought to extradite the petitioner, the court held that the one of the military officers who promised the petitioner immunity had authority to do so and that the promise was binding on the United States. *Id*. at 1534. The court also held that immunity from extradition "was an integral part of the immunity agreement and must be enforced." *Id*. at 1535. As a result, the court granted the petitioner a writ

of habeas corpus precluding his extradition. *Id*. at 1536.

The facts of this case fall between those of *Drayer* and *Plaster*. Mr. Legkodymov does not argue that any United States official ever promised him that he would be immune from extradition to France as part of a cooperation agreement. He does assert, however, that several Assistant United States Attorneys helped to facilitate the alleged non-prosecution agreement with France and set up the video conference where the parties made the alleged agreement. He also asserts that one of the Assistant United States Attorneys was fluent in French and "explored the concept of a French non-prosecution agreement with Mr. Legkodymov and counsel at length." (ECF No. 9, PageID # 615). He alleges that the Assistant United States Attorney was the one who determined that, while the French legal system does not use the term "immunity," French prosecutors could agree not to prosecute Mr. Legkodymov, allegedly calling that a "distinction without a difference." *Id*. at 615-16.

Neither party has cited to any cases directly addressing whether a petitioner may obtain habeas relief to prevent extradition where United States officials did not themselves offer the petitioner immunity, but where United States officials allegedly helped to broker the agreement. My independent research also has not identified any such cases. In the absence of clear precedent, I conclude that, while Mr. Legkodymov's arguments are not without some force in light of *Plaster* and dicta from *Drayer* regarding the importance of the United States' role in the agreement, the alleged non-prosecution agreement does not provide a basis to grant Mr. Legkodymov habeas relief precluding his extradition. Respondents have submitted a letter from a French Prosecutor, Natacha Rateau, stating that the French investigating judges did not reach any agreement with Mr. Legkodymov because "in accordance with our Code of Civil Procedure, this type of agreement concerning the immunity of a person implicated in criminal proceedings cannot be concluded by the Investigating Judge or Public Prosecutor in charge of the case." (ECF No. 7-3).

Mr. Legkodymov argues that the letter is disingenuous and relies on the same "distinction without a difference" that the Assistant United States Attorney allegedly referred to. However, a French court is better positioned to evaluate the parties' arguments regarding the impact and enforceability of the alleged non-prosecution agreement under French law than a United States court is. Indeed, a number of courts have held that an individual should raise the question of whether he or she is immune from prosecution under foreign law in the courts of that country, rather than in a United States court. *See*, *e.g.*, *Matter of Extradition of Berrocal*, No. 17-22197, 2017 WL 3776953, at *27 (S.D. Fla. Aug. 31, 2017) ("It is well established that an immunity defense—which is undeniably an affirmative defense—is not a proper consideration in an extradition proceeding."); *Matter of Extradition of Bravo*, No. 19-23851, 2023 WL 6462456, at *15 (S.D. Fla. Oct. 3, 2023) (holding that issue of whether petitioner was immune from prosecution in Argentina pursuant to Argentinian amnesty laws could not be adjudicated in extradition proceeding); *United States v. Bogue*, No. 98-572-M, 1998 WL 961369, at *2 (E.D. Pa. Dec. 11, 1998) ("Notwithstanding this Court's decision to reject Mr. Bogue's immunity claims, Mr. Bogue is free to attempt to raise the immunity defense in the requesting country of France.").

While none of those cases involved the type of immunity agreement allegedly at issue here, I nonetheless find them instructive. Although Mr. Legkodymov alleges that Assistant United States Attorneys were involved in brokering the purported non-prosecution agreement, he does not assert that any United States official made any affirmative promise regarding his extradition. The absence of any promise on the part of United States officials distinguishes this case from *Plaster*. Instead, the question is whether French prosecutors should be bound by their alleged promise that Mr. Legkodymov would not be prosecuted in France. And the "appropriate place to raise a defense based upon the cooperation agreement would be in any subsequent [French] proceeding." *Drayer*, 190 F.3d at 413.

Thus, I conclude that the alleged existence of the non-prosecution agreement does not provide a basis to grant Mr. Legkodymov habeas relief, even assuming the Court has jurisdiction to consider Mr. Legkodymov's argument, and I recommend that the Court deny his first ground for relief. I emphasize that my recommendation "does not foreclose [Mr. Legkodymov] from making his immunity arguments to the Secretary of State, who exercises much broader discretion in international extradition cases than does the Federal Courts." *Bogue*, 1998 WL 961369, at *2.[1]

### B.  <u>Non Bis in Idem</u>

Mr. Legkodymov next argues that extradition is precluded under Article 8(1) of the extradition treaty between the United States and France (the "Treaty"), which provides that "[e]xtradition shall not be granted when the person sought has been finally convicted or acquitted in the Requested State for the offense for which extradition is requested." (ECF No. 7-2, PageID # 341). By contrast, Article 8(2) provides that extradition shall not be refused "on the grounds that the authorities in the Requested State have decided not to prosecute the person sought for the acts for which extradition is requested . . . ." *Id*.

The parties dispute the scope of Article 8(1), also known as a "Non Bis in Idem" provision. Respondents argue that the use of the term "offense" in Article 8(1), when contrasted with the use of the term "acts" in Article 8(2), means that the Non Bis in Idem provision only prohibits extradition where the requesting state is seeking to prosecute the person for the same offenses. Respondents further argue that, to determine whether France is seeking to prosecute Mr. Legkodymov for the same offenses he faced prosecution for in the United States, the court should apply the test under the Double Jeopardy Clause of the Fifth Amendment, as set forth in *Blockburger v. United States*, 284 U.S. 299 (1932). Under that test, a court considers "whether each provision requires proof of a fact which the other does not." *Id*. at 304. In response, Mr.

---

[1] Because the force and effect of any alleged non-prosecution agreement is more properly raised in a French court, I deny Mr. Legkodymov's request for an evidentiary hearing regarding the existence of the agreement.

Legkodymov argues that Article 8(1) prohibits extradition whenever the requesting state is seeking to extradite the person for charges arising out of the same acts for which the person has been convicted or acquitted in the requested state. He further argues that, even assuming *Blockburger* applies, the offenses are the same under that test.

       1.   *The Scope of Article 8(1)*

When interpreting the language of a treaty, a court begins with the treaty's text. *Medellin v. Texas*, 552 U.S. 491, 506 (2008). "Because a treaty ratified by the United States is 'an agreement among sovereign powers,' [courts] also consider[] as 'aids to its interpretation' the negotiation and drafting history of the treaty as well as 'the postratification understanding' of signatory nations." *Id*. at 507 (quoting *Zicherman v. Korean Air Lines Co*., 516 U.S. 217, 226 (1996)).

Magistrate Judge Brown considered and rejected Mr. Legkodymov's interpretation of Article 8(1), holding that Article 8(1) "prohibits extradition where the individual has been convicted of the same offense, which is not the case here." (ECF No 1-3, PageID # 32) (emphasis omitted). The strong weight of authority supports Magistrate Judge Brown's conclusion.

In *Rana v. Jenkins*, 113 F.4th 1058 (9th Cir. 2024), for example, the court considered language in Article 6 of the extradition treaty between the United States and India that similarly precluded extradition when the person had been convicted or acquitted in the Requested State for the "offense" for which extradition was sought. *Id*. at 1064. The court held that the text of Article 6 "compels a reading of 'offense' that requires comparing the elements of each country's crimes." *Id*. at 1064.

The court noted that, as with the extradition treaty between the United States and France, Paragraph 1 of Article 6 provided that extradition shall not be granted "when the person sought has been convicted or acquitted in the Requested State for the *offense* for which extradition is requested," while Paragraph 2 provided that extradition would not be precluded by the fact that

the Requested State had decided not to prosecute the individual "for the *acts* for which extradition is requested . . . ." *Id*. (emphasis in original). The court noted that "[w]hen treaties use differing language in parallel provisions, it 'implies that the drafters of the [Treaty] understood the word[s] [] to mean something different' . . . ." *Id*. (quoting *Air France v. Saks*, 470 U.S. 392, 398 (1985)). Thus, "the most natural reading of Paragraph 1 compels a definition of 'offense' that is distinct from 'acts.'" *Id*. at 1064-65. The *Rana* court also held that its interpretation was supported by "comparing treaties that specifically use the word 'acts' in their Non Bis in Idem provisions." *Id*. at 1066. Finally, the court held that the State Department's technical analysis, which stated that the Non Bis in Idem provision applied only when the person had been convicted or acquitted of "exactly the same crime," was entitled to "substantial weight" and supported the court's conclusion. *Id*. (emphasis omitted).

The Fourth Circuit reached the same holding in *Ye Gon v. Holt*, 774 F.3d 207 (4th Cir. 2014), which involved an extradition treaty between the United States and Mexico. The court noted that the Non Bis in Idem provision referred to "the offense," while the dual criminality provision in Article 2 of the treaty prevented extradition for crimes unless they were "wilful acts" punishable under the laws of both countries. *Id*. at 215 (emphasis omitted). The court held that the "most natural reading of 'offense,' as distinct from 'acts' is that 'offense' refers to the definition of the crime itself," which "weigh[ed] heavily in favor of the government's elements-based *Blockburger* approach." *Id*. The court also found it persuasive that the State Department had interpreted similar provisions in other treaties as requiring a *Blockburger* analysis. *Id*.; *see also United States v. Duarte-Acero*, 208 F.3d 1282, 1286 (11th Cir. 2000) ("the provision bars a successive prosecution only when the second criminal proceeding is for the same 'offense.' A broader formulation would have used the word 'act,' 'action,' or 'conduct.'").

These decisions are persuasive, and their reasoning applies fully here. The Non Bis in Idem

provision in the Treaty prohibits extradition where the person has been convicted or acquitted of the same *offense*, while Article 8(2) provides that extradition shall not be refused if the requested state decided not to prosecute the person for the same *acts*. (ECF No. 7-2, PageID # 341). The use of different terms in the two paragraphs is a strong indication that the parties intended Article 8(1) to cover only offenses, not acts. At least one other district court has reached the same conclusion. *See McKnight v. Torres*, No. CV 07-5541 CAS (AJWx), 2008 WL 11441887, at *8-11 (C.D. Cal. Feb. 12, 2008) (holding that Non Bis in Idem provision in extradition treaty between United States and France bars extradition only where defendant is convicted of the same offense, not where different offenses involve the same underlying conduct).

That conclusion is further bolstered by changes the parties made in the current version of the Treaty. As the *Rana* court noted, the prior 1971 version of the Treaty prohibited extradition where the Requested State had prosecuted the individual for the same acts. *Rana*, 113 F. 4th at 1066. However, when the parties rewrote the Treaty in 1996, they amended the Non Bis in Idem provision to use the term "offense." *Id*. The court held that the history of the French Treaty "demonstrate[s] that, when the United States and its allies want to protect similar *conduct* from being dually prosecuted in each nation, they use language to evince that intent." *Id*.

Mr. Legkodymov is correct that not every court has reached the same conclusion. He relies heavily on the Second Circuit's decision in *Sindona v. Grant*, 619 F.2d 167 (2d Cir. 1980). That case involved the United States' extradition treaty with Italy which provided that extradition was precluded if the person was being or had been prosecuted "for the offense for which his extradition is requested." *Id*. at 176. Unlike the *Rana* and *Ye Gon* courts, however, the *Sindona* court held that the Non Bis in Idem provision precluded extradition whenever the requesting state sought extradition based on the same conduct, not merely for the same offense.

The court began by noting that "[t]he widespread use of such clauses has produced

relatively little in the way of reported decisions or helpful commentary with respect to their application." *Id*. In the absence of clear guidance, the court rejected the Government's argument that the court should apply the *Blockburger* test, holding that doing so would be a "crabbed and wholly inappropriate reading" of the treaty, as foreign countries "could hardly be expected to be aware" of *Blockburger*. *Id*. at 178. Instead, the *Sindona* court held the proper test was whether the same conduct or transaction underlay the criminal charges in both jurisdictions. *Id*. In support, the court relied on Justice Brennan's concurring opinion in *Ashe v. Swenson*, 397 U.S. 436 (1970), in which Justice Brennan stated that the Double Jeopardy Clause required the prosecution to join all charges against a defendant arising out of a single criminal act, occurrence, or transaction in one prosecution. *Id*. (citing *Ashe*, 397 U.S. at 453-54) (Brennan, J. concurring)). The court also relied on an internal Department of Justice policy, known as the "*Petite* policy´ in light of *Petite v. United States*, 361 U.S. 529 (1960), of not bringing federal charges where a state has prosecuted the defendant for the same acts. *Id*.

Mr. Legkodymov argues that Magistrate Judge Brown ignored *Sindona* and failed to properly analyze the circuit split regarding the scope of the Non Bis in Idem provision. However, while Magistrate Judge Brown did not expressly cite *Sindona*, he noted the existence of a "Circuit split" in a footnote and stated that he did not view the Treaty's language in the same manner as Mr. Legkodymov. (ECF No. 1-3, PageID # 33 n. 6). That footnote makes clear that Magistrate Judge Brown was aware of *Sindona* but did not find its reasoning compelling.

Moreover, while *Sindona* supports Mr. Legkodymov's position, subsequent courts have largely rejected its reasoning. In *Rana*, for example, the court held that *Sindona* was "less persuasive" for several reasons, including that the Supreme Court eroded Justice Brennan's concurrence in *Ashe* when it decided *United States v. Dixon*, 509 U.S. 436 (1970), which struck down the "same conduct" rule for double jeopardy analysis. *Id*. at 1068. The court also held that

14

*Sindona*'s reliance on the *Petite* policy was unwarranted because an internal DOJ policy "has no bearing on what the word 'offense' means in the Treaty, particularly where the policy does not use the word." *Id*. Finally, the court rejected *Sindona*'s statement that a foreign country could not be expected to be aware of *Blockburger*, concluding that "[w]hile that may have been true in 1980, the Treaty [between the United States and India] was signed nearly twenty years later in 1997." *Id*. The *Ye Gon* court likewise rejected *Sindona* as based on "shaky legal foundations" that "prove[d] inadequate upon application." 774 F.3d at 216. Those decisions are well-reasoned, and I conclude that *Sindona*'s interpretation of the Non Bis in Idem provision is not persuasive.

Mr. Legkodymov also argues that his interpretation is supported by the Treaty's dual criminality provision, which is contained in Article 2. (ECF No. 7-2, PageID # 335). That provision, titled "Extraditable Offenses," states in Paragraph 1 that "acts" shall be extraditable if they are punished under the law of both states. *Id*. In Paragraph 3, however, it provides that an "offense" is extraditable regardless of whether the laws in the contracting states describe the offense by the same terminology or place the offense in the same category. *Id*. Mr. Legkodymov argues that Article 2's apparently inconsistent use of "acts" and "offenses" shows that the terms have the same meaning in the Treaty.

The *Rana* court considered and rejected an identical argument in the context of the treaty between the United States and India. The court noted that, while identical words in different sections are typically intended to have the same meaning, the dual criminality provision "contains limiting language" instructing that "'offense' is to be interpreted '[f]or the purposes of this Article.'" *Rana*, 113 F.4th at 1065. "In other words, the Treaty explicitly states that for the purposes of the dual criminality provision, whether the offenses in each state use the same terminality (or, in other words, elements) is irrelevant." *Id*. By contrast, "[n]o such limiting language exist[ed]" in the Non Bis in Idem provision. *Id*.

15

The same is true with respect to the Treaty here, as the dual criminality provision states that "[f]or the purposes of this Article," it is irrelevant whether the laws in the contracting states place the offense within the same category or use the same terminology. (ECF No. 7-2, PageID # 335). In light of that limiting language, Article 2's use of "acts" and "offenses" does not compel an interpretation of the Non Bis in Idem provision that conflates acts and offenses.

Finally, Mr. Legkodymov argues that the French language version of the Treaty is more ambiguous with respect to the use of "acts" and "offenses" than the English language version. He correctly notes that, under the Treaty, both the English and French language versions are "equally authentic." (ECF No. 7-2, PageID # 356). However, while Mr. Legkodymov may be correct that the French language version contains some ambiguities regarding the meaning of "acts" and "offenses" in Article 2, he concedes that Article 8(1) of the French language version uses the term "offenses," while Article 8(2) uses the term "acts," just like the English language version. (ECF No. 9, PageID # 633). The French language version of the Treaty thus does not support Mr. Legkodymov's interpretation. Accordingly, I agree with Magistrate Judge Brown that the Non Bis in Idem provision of the Treaty applies only where the individual was convicted or acquitted of the same offense under a *Blockburger* analysis.

2. *Whether France is Seeking Extradition for the Same Offenses*

Mr. Legkodymov also argues that, even assuming the *Blockburger* test applies, Magistrate Judge Brown erred in holding that the French offenses required proof of facts that the 18 U.S.C. § 1960 charge did not. Mr. Legkodymov's argument is not well-taken.

§ 1960 provides that an individual may not knowingly conduct, control, manage, supervise, direct, or own all or part of an unlicensed money transmitting business. 18 U.S.C. § 1960(a). Among other things, § 1960 requires the Government to prove the existence of a money transmitting business, which the statute defines in relevant part as a business affecting interstate

16

or foreign commerce that "involves the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity." 18 U.S.C. § 1960(b)(1)(C).

Mr. Legkodymov argues that the two French money laundering charges require proof of the same facts as § 1960. Those charges are brought under Articles 324-2 2°, 324-1(2), 324-1, and 132-71 of the French Penal Code. Article 324-1 defines money laundering as "the act of facilitating, by any means whatsoever, the false justification of the origin of the assets or income of the perpetrator of a crime or misdemeanor that has procured the latter a direct or indirect profit." (ECF No. 7-2, PageID # 463). It further defines money laundering as "assisting in the investment, concealment or conversion of the direct or indirect proceeds of a crime or misdemeanor." *Id*. Neither definition requires proof of a money transmitting business as that term is used in § 1960.

The French money laundering statutes also require proof of one or more facts that § 1960 does not. Article 324-1 criminalizes "facilitating . . . the false justification of the origin of the assets or income" or "assisting in the investment, concealment or conversion" of the direct or indirect proceeds of a crime. (ECF No. 7-2, PageID # 463). § 1960 does not require proof that the defendant facilitated the false justification of the origin of the assets, nor does it require proof that the defendant assisted in the investment, concealment, or conversion of the proceeds.

Finally, Mr. Legkodymov argues that the criminal conspiracy charge under Article 450-1(1) fails the *Blockburger* test because French prosecutors are using the charge "as a form of principal actor liability against an otherwise secondary Mr. Legkodymov." (ECF No. 9, PageID # 627). However, considering the elements of the offense, French prosecutors must prove that Mr. Legkodymov was part of a group formed or conspiracy established with a view to the preparation of one or more felonies or misdemeanors punishable by at least five years in prison. (ECF No. 7-2, PageID # 461). § 1960 does not require the government to prove the existence of a group or

17

conspiracy. Likewise, the French conspiracy statute does not require proof of a money transmitting business. Each statute therefore requires proof of a fact that the other does not.

In sum, Magistrate Judge Brown correctly held that the Non Bis in Idem provision in the Treaty only prohibits extradition where the requesting state is seeking to prosecute an individual for the same offense—not the same underlying acts—as the prior prosecution in the requested state. And, because the relevant United States and French statutes each require proof of at least one fact that the other does not, France is not seeking to extradite Mr. Legkodymov on the same offense. Article 8(1) thus presents no obstacle to extradition.

### C.  **Probable Cause**

In his third ground for relief, Mr. Legkodymov asserts that he is entitled to habeas relief because Magistrate Judge Brown erroneously found that there was sufficient probable cause to support his extradition on the French charges. "On habeas review of an extradition order, the Court must review 'whether there was any evidence warranting the finding that there was reasonable ground to believe the accused guilty.'" *Nagy*, 2018 WL 3999683, at *2 (quoting *Fernandez*, 268 U.S. at 312). "An extradition proceeding is not a forum in which to establish the guilt or innocence of the accused; rather the sole inquiry is into probable cause." *Drayer*, 190 F.3d at 415. "'The probable cause standard applicable to an extradition hearing is the same as the standard used in federal preliminary hearings." *In re Extradition of Robinson*, No. 3:11MJ7047, 2011 WL 6072102, at *3 (N.D. Ohio Oct. 21, 2011) (quoting *Hoxha v. Levi*, 465 F.3d 554, 561 (3d Cir. 2006)).

As noted above, French authorities are seeking to extradite Mr. Legkodymov on three charges: (1) money laundering by aiding an organized group to falsify the origin of assets or income of the perpetrator of a crime; (2) money laundering by participation in an organized group for concealment or conversion of the proceeds of a crime; and (3) criminal conspiracy to prepare the crime of money laundering.

Mr. Legkodymov argues that there is no probable cause to support those charges because the French prosecutors rely on the same facts that United States prosecutors relied on to prosecute him in the Eastern District of New York. He accuses French officials of "the criminal law equivalent of copying your classmate's homework and making a few changes." *Id*. at PageID # 635. That argument is merely a restatement of Mr. Legkodymov's argument that Article 8(1) of the extradition treaty prohibits extradition where the charges in the requesting state are based on the same conduct as the charges for which the individual faced prosecution in the requested state. For the reasons discussed above, Mr. Legkodymov's argument is not well-taken.

Mr. Legkodymov also argues that the French case suffers from two fatal flaws. First, he asserts that the French prosecutors have not pointed to any affirmative acts that Mr. Legkodymov took to conceal criminal proceeds or to conspire to do so. Second, he argues that French prosecutors have not provided any evidence that he intended to commit a criminal offense.

As Magistrate Judge Brown held, however, chat logs showed that Mr. Legkodymov knew that a substantial portion of Bitzlato's profits came from drug trafficking and other crimes, but took no actions to stop those activities despite discussing the possibility of excluding criminals. (ECF No. 1-3, PageID # 29-30). Instead, Mr. Legkodymov and other Bitzlato executives "retained the clientele and laundered the proceeds." *Id*. at PageID # 30. Applying the highly constrained standard of review in this habeas proceeding, evidence supported Magistrate Judge Brown's finding that there was reasonable cause to believe Mr. Legkodymov committed the offenses for which France seeks extradition.

Mr. Legkodymov relies on *Petition of France for Extradition of Sauvage*, 819 F. Supp. 896 (S.D. Cal. 1993), which denied extradition to France on the basis that there was not probable cause to believe that the person had committed the charged offense. *Sauvage* was not a habeas case, and instead involved an initial determination regarding whether probable cause supported

19

the French charges. *Id*. at 897. Regardless, *Sauvage* is distinguishable. There, France sought to extradite an individual to face charges of swindling arising out of his alleged provision of faith healing services. *Id*. at 898-99. The court held that there was not probable cause to support the criminal intent element because there was "no evidence from which this court could infer that Sauvage did not believe in his power of faith healing," an omission the court found particularly troubling given the First Amendment's guarantee of free exercise of religion. *Id*. 901. Here, by contrast, the government provided evidence that Mr. Legkodymov knew that Bitzlato was being used to facilitate crimes, including drug trafficking, but did nothing to stop illegal activity on the site. I recommend that the Court deny Mr. Legkodymov's third ground for relief.

### D.  Rule of Speciality

Finally, Mr. Legkodymov asserts that he is entitled to habeas relief because Magistrate Judge Brown's extradition order did not expressly limit extradition to the three charges on which the French sought extradition, and thus violated a legal principle known as the "rule of speciality." In their response to the petition, Respondents acknowledge that Article 19(1) of the extradition treaty prohibits France from prosecuting Mr. Legkodymov on charges beyond the three offenses on which France sought extradition. (ECF No. 7-2, PageID # 350-51). Respondents also note that the certification from Magistrate Judge Brown's opinion and certification specifically states that "the crimes of aggravated money laundering and conspiracy" are extraditable offenses and that extradition is warranted on those charges. (ECF No. 1-3, PageID # 34). Mr. Legkodymov does not raise any further argument regarding this ground for relief in his traverse. His fourth ground for relief is not well-taken and does not provide a basis for habeas relief.

### V.  RECOMMENDATION

For the reasons set forth above, I RECOMMEND that the Court DENY Mr. Legkodymov's petition for a writ of habeas corpus.

20

Dated: June 15, 2026

*/s Jennifer Dowdell Armstrong*
Jennifer Dowdell Armstrong
U.S. Magistrate Judge

**NOTICE TO PARTIES REGARDING OBJECTIONS**

Local Rule 72.3(b) of this Court provides:

**Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a <u>de novo</u> determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

21

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).